IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIAM H. DIEROLF, IV,** | : | |
| **Petitioner** | : | **CIVIL NO. 1:CV-11-01999** |
| **v.** | : | **(Judge Rambo)** |
| **BRIAN THOMPSON,** | : | |
| **Respondent** | : | |

**M E M O R A N D U M**

Petitioner William H. Dierolf, IV ("Dierolf"), who is presently incarcerated at

the State Correctional Institution in Mercer, Pennsylvania ("SCI-Mercer"), initiated

this action by filing a *pro se* petition for writ of habeas corpus pursuant to the

provisions of 28 U.S.C. § 2254.  (Doc. 1.)  In the petition, Dierolf challenges his 2007

convictions and sentence in the Court of Common Pleas of Luzerne County,

Pennsylvania ("trial court" or "Luzerne County court").  For the reasons that follow,

the petition will be denied.

I.    **Background**

On January 18, 2007, Dierolf was found guilty of rape, involuntary deviate

sexual intercourse, statutory sexual assault, and sexual assault following a jury trial in

the Luzerne County court.  (Doc. 1 at 1.)  The Pennsylvania Superior Court

summarized the relevant facts as follows:

On July 29, 2005, the victim, Dierolf's fourteen-year-old niece, went to his house to babysit Dierolf's daughter after school. At some time prior to 9:00 p.m., the victim fell asleep on a couch in the living room. She was fully clothed and wearing a skirt at the time. When she fell asleep, Dierolf was sitting at a computer in the same room.

The fourteen-year-old victim awoke to find Dierolf lying on top of her. He initially used his mouth and tongue to penetrate her vagina. He then moved her underwear to the side, pulled out his penis, penetrated her, and forced her to have sex with him. She was unable to push him off because he was too heavy. When she told him he was hurting her, he replied that he was not done. After a few minutes, he stopped.

Dierolf then got up and went for a shower while the victim stayed on the couch. She was afraid to walk home because it was dark. She eventually took a bath and used soap to clean herself. Since she had forgotten to bring extra clothes, she put on the same clothes she was wearing earlier, and went to sleep for the night on a different couch.

Later the following evening, the victim told her grandmother that Dierolf had raped her. Subsequently, the victim went to the hospital for examination. There, she disclosed that she had a bruise on her leg and that it burned when she urinated. After a full gynecological examination, there was no definitive evidence of rape; however, subsequent investigation revealed that Dierolf's semen and saliva were present on the underwear that the victim was wearing on the night in question. Dierolf was later arrested and charged with various crimes, including rape.

(Doc. 15-8 at 1-2, *Commonwealth v. Dierolf*, No. 1050 MDA 2009 (Pa. Super. Ct. Sept. 24, 2010).) On April 30, 2007, the trial court sentenced Dierolf to an aggregate term of incarceration of ten (10) to twenty (20) years, followed by a consecutive five (5) year term of probation. Dierolf was also ordered to register as a sexually violent

predator.  Dierolf filed a timely, counseled direct appeal to the Pennsylvania Superior Court, which affirmed the judgment of sentence by opinion dated August 8, 2008. (Doc. 15-4 at 1-12, *Commonwealth v. Dierolf*, No. 962 MDA 2007 (Pa. Super. Ct. Aug. 8, 2008).)  On March 9, 2009, Dierolf filed a counseled petition for post-conviction relief under Pennsylvania's Post-Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. §§ 9541-9546.  The trial court, now acting as PCRA court, held an evidentiary hearing on May 22, 2009.  At the conclusion of the hearing, the PCRA court denied Dierolf's petition.  Dierolf timely filed a counseled appeal with the Pennsylvania Superior Court.  By memorandum and opinion dated September 24, 2010, the Superior Court affirmed the denial of PCRA relief.  (Doc. 15-8 at 1-13.) Dierolf then filed a petition for allowance of appeal with the Pennsylvania Supreme Court, which denied the petition by order dated July 26, 2011.  (Doc. 15-9, *Commonwealth v. Dierolf*, 763 MAL 2010 (Pa. July 26, 2011).)

Dierolf timely filed the instant petition for writ of habeas corpus on October 28, 2011.  (Doc. 1.)  He also filed a memorandum of law.  (Doc. 11.)  Respondents filed a response to the petition on April 4, 2012.  (Doc. 15.)  Dierolf filed his reply brief on June 1, 2012.  (Doc. 18.)  Thus, this matter is now ripe for disposition.

## II.  **Discussion**

In his petition, Dierolf raises the following claims as grounds for relief: (1) trial counsel provided ineffective assistance during the course of the trial; (2) Dierolf was denied his Fifth Amendment right against self-incrimination at trial; (3) Dierolf was denied his right to substantive due process with respect to the charges lodged against him and his defense thereof; and (4) Dierolf was denied his right to procedural due process with respect to various trial court rulings during trial.  (Doc. 1.)  In their response to Dierolf's petition, Respondents contend the following: (1) Dierolf's Claims Two through Four alleging violations of his right against self-incrimination and of his substantive and procedural due process rights were not presented to the state courts and therefore should be dismissed; and (2) Dierolf's exhausted claims of ineffective assistance of counsel should be denied.  (Doc. 15.)

For purposes of discussion, the court will first discuss exhaustion and procedural default as to Dierolf's Claims Two through Four, followed by a discussion of the ineffective assistance of counsel claims.

### A.  **Exhaustion and Procedural Default**

As stated above, Respondents contend that Dierolf's Claims Two through Four have not been presented to the state courts, and therefore this court should decline to

review those claims on the basis that they have not been exhausted. Thus, the court must determine whether Dierolf's three claims have been adequately exhausted in the state courts and, if not, whether the circumstances of his case are sufficient to excuse his procedural default.

The provisions of the federal habeas corpus statute at 28 U.S.C. § 2254(b) require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief.[1] To comply with the exhaustion requirement, a state prisoner first must have fairly presented his constitutional and federal law issues to the state courts through direct appeal, collateral review, state habeas proceedings, mandamus proceedings, or other available procedures for judicial review. *See, e.g.*, *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Doctor v. Walters*, 96 F.3d 675, 678 (3d Cir. 1996), *abrogated on other grounds by Beard v. Kindler*, 558 U.S. 53 (2009); *Burkett v. Love*, 89 F.3d 135, 137 (3d Cir. 1996). Moreover, a petitioner must present

_____

[1] 28 U.S.C. § 2254(b)(1) provides the following:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –
    (A) the applicant has exhausted the remedies available in the courts of the State; or
    (B)(I) there is an absence of available State corrective process; or
    (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

every claim raised in the federal petition to the state's trial court, intermediate appellate court, and highest court before exhaustion will be considered satisfied.[2] *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). The petitioner has the burden of establishing that the exhaustion requirement has been met. *Ross v. Petsock*, 868 F.2d 639, 643 (3d Cir. 1999); *O'Halloran v. Ryan*, 835 F.2d 506, 508 (3d Cir. 1987).

Exhaustion is not a jurisdictional limitation, however, and federal courts may review the merits of a state petitioner's claim prior to exhaustion when no appropriate state remedy exists. *Christy v. Horn*, 115 F.3d 201, 206 (3d Cir. 1997); *Doctor*, 96 F.3d at 681; *Carter v. Vaughn*, 62 F.3d 591, 594 (3d Cir. 1995). Nevertheless, a petitioner shall not be deemed to have exhausted state remedies if he has the right to raise his claims by any available state procedure. 28 U.S.C. § 2254(c).

Turning to procedural default, if a petitioner presents unexhausted habeas claims to a federal court, but state procedural rules bar further state court review, the federal court will excuse the failure to exhaust and treat the claims as exhausted. *Wenger v. Frank*, 266 F.3d 218, 223 (3d Cir. 2001); *Lines v. Larkins*, 208 F.3d 153,

---

[2] Pursuant to Pennsylvania Supreme Court Order 218, effective May 9, 2000, issues presented to the Pennsylvania Superior Court are considered exhausted for the purpose of federal habeas corpus relief under section 2254. *See In re: Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases*, No. 218, Judicial Administration Docket No. 1 (May 5, 2000) (per curiam).

160 (3d Cir. 2000); *see Teague v. Lane*, 489 U.S. 288, 297-98 (1989).  Although deemed exhausted, such claims are considered procedurally defaulted.  *Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *Lines*, 208 F.3d at 160.

A federal habeas court cannot review the merits of procedurally defaulted claims unless the petitioner demonstrates either: (1) "cause" for the procedural default and "actual prejudice" as a result of the alleged violation of federal law; or (2) failure to consider the claims will result in a "fundamental miscarriage of justice."  *See McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999); *Coleman*, 501 U.S. at 750; *Caswell v. Ryan*, 953 F.2d 853, 857, 861-62 (3d Cir. 1992).  To satisfy the first exception, a petitioner must show: (1) cause for his failure to raise his claim in state court; and (2) prejudice to his case as a result of that failure.  *Coleman*, 501 U.S. at 750.  To demonstrate "cause" for a procedural default, the petitioner must show that something "external" to the defense impeded the petitioner's efforts to comply with the state's procedural rule.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Once "cause" has been successfully demonstrated, a petitioner must then prove "prejudice." "Prejudice" must be something that "worked to [petitioner's] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *Id*. at 494.

Alternatively, a federal court may excuse a procedural default when the petitioner establishes that failure to review the claim will result in a fundamental miscarriage of justice. *See Werts v. Vaughn*, 228 F.3d 178, 192-93 (3d Cir. 2000). A credible allegation of "actual innocence" constitutes a "miscarriage of justice" that enables a federal court to hear the merits of otherwise procedurally defaulted habeas claims. *Hubbard v. Pinchak*, 378 F.3d 333, 338 (3d Cir. 2004). The fundamental miscarriage of justice exception, as defined by the United States Supreme Court, is confined to cases of actual innocence as compared to legal innocence, where the petitioner can show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt in light of new evidence. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). "To be credible," a claim of actual innocence must be based on reliable evidence not presented at trial. *Id*. at 324.

In the instant case, Respondents argue that Dierolf's Claims Two through Four have not been exhausted. The court will discuss exhaustion and procedural default as to these claims in turn.

**1.  Claim Two**

In his second claim for habeas relief, Dierolf claims that he was denied his

Fifth Amendment right against self-incrimination at trial.  Specifically, Dierolf claims

this right was violated in the following manner:

> 1) The Defendant was compelled to testify under duress and contrary to
> his will at his trial by his defense counsel who threatened to immediately
> leave his defense if he did not comply;
> 2) The Learned Court did not advise the Defendant of his right to remain
> silent in his defense or the consequences of self-incrimination;
> 3) The Defendant was subsequently led through a colloquy by his own
> attorney in which he fully admitted to a lesser offense in the matter;
> 4) The admission to this lesser charge was injurious to his defense and
> placed his *mens rea* before the jury significantly prejudicing the outcome
> of the trial; [and]
> 5) The Defendant was unaware of the Constitutional protection against
> self-incrimination and relied entirely upon his attorney and the Learned
> Court in complying with this decision.

(Doc. 11-2 at 24.)  Respondents argue that even though Dierolf did address the

protection against self-incrimination in the context of Claim One, that trial counsel

was ineffective for failing to object to the prosecutor's references to his post-arrest

silence, he did not separately raise this underlying self-incrimination claim.  For his

part, Dierolf agrees with Respondents that he raised his right to protection against

self-incrimination in the context of Claim One, (*see* Doc. 18 at 13), but makes no

argument with respect to exhaustion of his other arguments in support of Claim Two.

Specifically, in his memorandum of law in support of his petition, Dierolf simply argues the merits of his claim, without addressing exhaustion; in his traverse, he simply provides a lengthy excerpt from a Boston College Law Review note on exhaustion and mixed petitions, with no additional argument addressing his failure to exhaust. (*See* Doc. 18 at 13-24.)

Upon consideration of this claim, the court concludes the following. First, to the extent that Dierolf raises the issue of his right to protection against self-incrimination in the context of Claim One, that trial counsel was ineffective for failing to object to the prosecutor's references to his post-arrest silence, the court will address this claim in its discussion of Claim One, *infra*. Second, as to the remaining sub-issues in Claim Two, such as, *inter alia*, Dierolf's claims that he was compelled to testify at trial under duress and that the trial court did not advise him that he was not required to testify in his own defense at trial, these claims are unexhausted because they were never raised in the state courts. Further, because it appears that any second PCRA petition filed by Dierolf would be untimely, *see* 42 Pa. Cons. Stat. Ann. § 9545(b) (petition must be filed within one year of the date judgment becomes final), this claim is procedurally defaulted. In this claim, Dierolf has failed to establish the cause necessary to excuse a procedural default. In the absence of cause,

the court will not address the issue of prejudice. Nor is Dierolf able to establish a

miscarriage of justice if this claim in his habeas petition is not considered by the

court. There was overwhelming evidence of his guilt, which included the victim's

credible testimony as well as physical evidence of the crimes charged found on the

victim's underwear. Thus, Dierolf cannot establish his actual innocence of the

crimes.

>    **2.    Claim Three**

In his third claim for habeas relief, Dierolf claims that he was denied his right

to substantive due process at trial under the Fifth and Fourteenth Amendment.

Specifically, Dierolf claims his rights here were violated in the following manner:

> 1) The Defendant places the claim that the factual basis for his *actus reus*
> in his case is in error as charged by the Commonwealth of Pennsylvania
> and that he is innocent of said charges;
> 2) The Defendant was incorrectly charged and said assumption is
> supported on a factual basis by the medical reports relating to the
> Complainant. Such reports were not explored by expert witnesses due to
> ineffective assistance of Defendant's trial counsel;
> 3) There was no attempt by the Defendant's trial counsel to negotiate and
> correct the presented charges by negotiation, motion or argument;
> 4) The Defendant was prohibited by the Learned Court from presenting
> testimony from expert and exculpatory witnesses both as to prior
> behavior of the Complainant which clearly demonstrated her willful and
> successful intent to extort money in two prior and identical instances
> from other men; [and]
> 5) The actions of Defendant's trial counsel and the Learned Court in this
> matter were sufficiently egregious as to render impossible a fair and

> impartial decision in this matter by the jury and that the degree of such error exceeded the Court benchmark standard of "harmless error."

(Doc. 11-3 at 5-6.) Dierolf clarifies this claim somewhat in his supporting memorandum of law. (Doc. 11.) Essentially, he argues that trial counsel and the trial court violated his constitutional rights by failing to "conduct a sufficient defense" and by committing "errors" that "prevented a demonstration of . . . innocence," respectively. (Doc. 11-3 at 9.)

This broad claim was not raised in the state courts and, therefore, is unexhausted. This claim is also procedurally defaulted. *See* 42 Pa. Cons. Stat. Ann. § 9545(b). Turning to whether procedural default can be excused, Dierolf states in his petition that this claim was not raised in the state courts because "ineffective assistance of counsel created no basis for appeal because the ground was not set forth in the original trial." (Doc. 1 at 9, 10.) While this statement is somewhat confusing as applied to exhaustion and procedural default, from his supporting memorandum of law it appears that Dierolf is setting forth two separate contentions: (1) his argument set forth above, that trial counsel and the trial court violated his constitutional rights by failing to "conduct a sufficient defense" and by committing "errors" that "prevented a demonstration of . . . innocence," respectively, and (2) he is actually innocent of the crimes for which he was convicted. (Doc. 11-3 at 9.)

First, to the extent that Dierolf is raising a stand-alone claim of actual innocence, such a claim must be denied because it is not cognizable in federal habeas. *Albrecht v. Horn*, 485 F.3d 103, 121-22 (3d Cir. 2007) (citing *Herrera v. Collins*, 506 U.S. 390 (1993)).[3]  However, a credible claim of actual innocence can act as a

---

[3] In *Johnson v. Sobina*, the district court explained:

The reason that stand-alone claims of actual innocence are not cognizable in federal habeas was given in *Herrera*.  In that case, the Supreme Court held that federal habeas review is not available "absent an independent constitutional violation occurring in the underlying state criminal proceeding," and that "a claim 'actual innocence' is not itself a constitutional claim."  506 U.S. at 400, 404.  The Court explained that once a defendant is found guilty after a fair trial in the state court, he no longer is entitled to a presumption of innocence, and thus comes before the federal habeas court not as one who is innocent, but as a convicted criminal.  *Id*. at 399-400.  Because such a determination in the state criminal trial is "a decisive and portentous event" and "[s]ociety's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the guilt or innocence of one of its citizens," freestanding claims of actual innocence are not reviewable in federal habeas actions.  *Id*. at 401 (internal quotations and citations omitted).  The Court noted that "[t]his rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution - not to correct errors of fact."  *Id*. at 400.  "Federal courts are not forums in which to relitigate state trials."  *Id*. at 401 (quotations and citation omitted).  Thus, the Court rejected Herrera's claim that, even if the proceedings were entirely fair and error free, his innocence would make his execution a constitutionally intolerable event.

Based upon the *Herrera* decision, the Third Circuit Court repeatedly has emphasized that in non-capital cases such is [sic] this case: "It has long been recognized that '[c]laims of actual innocence based on new discovered evidence' are never grounds for 'federal habeas relief absent an independent constitutional violation.'" *Fielder v. Varner*, 379 F.3d 113, 122 (3d Cir. 2004), quoting *Herrera*, 506 U.S. at 400; *Albrecht*, 485 F.3d at 121-22.  Thus, Petitioner's stand-alone claim of actual innocence is not cognizable under the federal habeas statute.

*Johnson v. Sobina*, No. 08-262, 2011 WL 1790053, at *7 (W.D. Pa. Mar. 30, 2011).

"gateway" through which a federal habeas petitioner may pass to have an otherwise procedurally barred constitutional claim considered on the merits. *See Schlup*, 513 U.S. at 315 (quoting *Herrera*, 506 U.S. at 404). Thus, the court will consider whether Dierolf has presented new evidence of his innocence in order to establish a miscarriage of justice that would allow this court to reach the merits of his barred claim, namely that he was denied his right to substantive due process at trial.

Under the two-prong standard for showing a fundamental miscarriage of justice, a petitioner first must "support his allegations of constitutional error with new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial." *Schlup*, 513 U.S. at 324. Second, once such evidence is presented, a petitioner must show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id*. at 327.

The first prong of the two part test, *i.e.*, whether the proffered evidence is new, provides that "evidence is new only if it was not available at trial and could not have been discovered earlier through the exercise of due diligence." *Amrine v. Bowersox*, 238 F.3d 1023, 1028 (8th Cir. 2001). In his supporting memorandum of law, Dierolf sets forth the following evidence: (1) the furniture and other surfaces at the crime

14

scene lacked bodily fluids; (2) the results of a polygraph examination of Dierolf by the Pennsylvania State Police indicates that he was being truthful regarding his version of the events; (3) behavior of the victim in two prior instances involving other persons was similar and involved extortion of money; (4) medical expert testimony that an intact hymen is "exceedingly rare in forcible rape victim," (Doc. 11-3 at 12); (5) trial counsel never initiated plea agreement discussions or attempted to "correct the *actus reus* erroneous charges which were filed," (*id*.); and (6) the victim's underwear was mishandled by police and the testing of it revealed inconclusive results on the presence of saliva. (Doc. 11-3 at 11-12.) While it is not entirely clear that Dierolf presents this evidence as "new" evidence to demonstrate that he is actually innocent of the crimes for which he was convicted, or is simply again arguing the merits of this claim, the problem is that none of this evidence is "new." Rather, the "new" evidence Dierolf puts forth in alleging actual innocence is "nothing more than a repackaging of the record as presented at trial." *Hubbard*, 378 F.3d at 341. Therefore, lacking any "new" evidence, he cannot meet the "more likely than not that no reasonable juror would have convicted him" standard. *Schlup*, 513 U.S. at 327. As a result, the court concludes that Dierolf's allegation of actual innocence, set forth as a "gateway" through which he may pass to have his otherwise procedurally barred

constitutional claim considered on the merits, *see id*. at 315, is insufficient to allow review of this procedurally defaulted claim.

### 3.    Claim Four

In his fourth claim for habeas relief, Dierolf claims that he was denied his right to procedural due process at trial under the Fifth and Fourteenth Amendments. Specifically, Dierolf claims that the trial court violated his rights in the following manner:

> 1) The Petitioner was not afforded an exculpatory medical expert witness to testify during the trial; said witness would have presented evidence that the medical information relating to the Complainant was inconsistent with the charges of Rape, Forcible Compulsion and Involuntary Deviate Sexual Intercourse;
> 2) The Learned Court did not allow the testimony of the Defense Private Investigator during the trial; said witness would have provided the Learned Court evidence of prior actions on the part of the Complainant in extorting monies from other non-charged individuals under identical circumstances;
> 3) The Learned Court did not *sua sponte* give cautionary instructions to the jury regarding the numerous, admitted and repeated constitutional violations of the Commonwealth of Pennsylvania in its cross-examination of the Defendant and in closing argument; [and]
> 4) The Learned Court erred when it allowed the introduction into evidence of the only item of apparel that was of significance to the case, her underwear, when by police admission there was an improper chain of custody on the item and there were three separate and different submissions by the Complainant of this item.

(Doc. 11-3 at 15-16.)

Respondents argue that this claim of trial court error was not fairly presented to the state courts, and thus it is unexhausted and should not be considered by this court. (Doc. 15-1 at 14-15.) In his petition, Dierolf asserts that he raised this claim both on direct appeal and in his PCRA petition. (Doc. 1 at 10.) However, the state court record belies Dierolf's assertion. In its September 24, 2010 memorandum affirming the PCRA court's decision, the Pennsylvania Superior Court held the following with respect to Dierolf's claims regarding trial court error:

> Next, in his second and fourth issues, Dierolf claims that he was prejudiced by the trial court's failure to issue a *sua sponte* cautionary instruction regarding the prosecutor's improper references. *See* Appellant's Brief, at 4-5. Additionally, in his sixth, seventh, and eighth issues, Dierolf claims that the trial court erred for other reasons, but we are unable to decipher any precise legal questions therein. *See id*. Nonetheless, all of these claims are waived because Dierolf raises them for the first time on collateral appeal.
>
> > To be eligible for relief under the PCRA, a petitioner must establish that his allegations have not been previously litigated or waived. An issue is deemed finally litigated for purposes of the PCRA if the "highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." If the allegations of error have not been previously litigated, a petitioner must also demonstrate that those allegations have not been waived. An allegation is deemed waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, [or] on appeal . . . ."

> *Commonwealth v. Bracey*, 568 Pa. 264, 272, 795 A.2d 935, 939 (2001)
> (internal citations omitted).
>
>       Here, the record reveals that the only issue litigated by this Court
> on direct appeal was whether there was sufficient evidence to sustain
> Dierolf's convictions, and we concluded that there was. *See*
> *Commonwealth v. Dierolf*, No. 962 MDA 2007, at 6 (Pa. Super., filed
> August 8, 2008) (unpublished memorandum). Although he could have,
> Dierolf never raised on direct appeal any issue alleging the *trial court's*
> failure to issue a *sua sponte* cautionary instruction. Moreover, he did not
> even raise these claims in his PCRA petition (*see* PCRA Petition, filed
> 3/9/09); they are being raised for the first time on collateral appeal.
> Thus, they are waived. Accordingly, these claims are not reviewable
> under the PCRA. *See* 42 Pa. Cons. Stat. Ann. § 9543(a)(3)(stating that
> PCRA petitioners must prove that the allegation of error has not been
> previously waived or litigated).

(Doc. 15-8 at 12-13, *Commonwealth v. Dierolf*, No. 1050 MDA 2009 (Pa. Super. Ct.

Sept. 24, 2010) (emphasis in original).) Of these five issues discussed by the

Superior Court regarding waiver, only Dierolf's second and fourth issues, as

presented to the Superior Court, have been raised in the instant petition. Further,

those second and fourth issues before the Superior Court are both contained in the

third sub-issue presented in this claim of trial court error. Again, in this third sub-

issue, Dierolf argues that the trial court erred in failing to provide a cautionary

instruction to the jury regarding the prosecutor's improper references in her cross-

examination of Dierolf and in her closing argument. As set forth above, the Superior

Court did not reach the merits of this sub-issue because it deemed issues two and four

before it waived.  (Doc. 15-8 at 12-13.)  As such, here the court would exercise *de novo* review of this claim on the merits.  *See* Section II.B, at 29-30 (addressing, *inter alia*, "adjudication on the merits").  However, after a careful reading of this entire claim as set forth in Dierolf's memorandum of law, the court cannot discern any argument on the merits with respect to Dierolf's sub-issue of *trial court error* regarding the prosecutor's remarks.  (*See* Doc. 11-3 at 15-25; Doc. 11-4 at 1.)  At most, Dierolf presents further argument on a harmless-error analysis, as employed by the Pennsylvania courts, of his claim relating to his post-arrest silence and resulting in ineffective assistance of counsel.  (*See* Doc. 11-3 at 18-24.)  As a result, the court sees two difficulties in addressing the merits of Dierolf's claim of trial court error here.  First, Dierolf has not presented any discernable argument here on the merits.  Second, the state court never performed a harmless-error analysis with respect to this sub-issue and, even if it had, under AEDPA, a federal habeas court does not defer to the state court's harmless-error analysis; rather, the district court assesses the prejudicial impact of a constitutional error at trial under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which provides that such error is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict," *id*. at 637.  Thus, Dierolf's harmless-error analysis under state law is inapplicable

here. Without any decipherable or applicable argument on this sub-issue, the court will not address this claim here. However, in the interest of justice to this *pro se* petitioner, the court will address Dierolf's assertion of trial court error in its discussion of the related ineffectiveness claim. *See* Section II.B.1.a, at 43. Otherwise, Dierolf will be denied relief on this sub-issue.

The remaining sub-issues in this claim are procedurally defaulted. *See* 42 Pa. Cons. Stat. Ann. § 9545(b). The doctrine of procedural default essentially provides that if a federal habeas petitioner has failed to present a federal claim in the state courts or failed to comply with a state procedural rule, and such failure would provide a basis for the state courts to decline to address the federal claim on the merits, then such federal claims may not be addressed by the federal habeas court. *See, e.g.*, *Wainwright v. Sykes*, 433 U.S. 72, 86-87 (1977) (failure to object at trial constituted waiver of issue under state law and, hence, a procedural default under federal habeas law); *Francis v. Henderson*, 425 U.S. 536, 542 (1976) (failure to comply with state procedure requiring challenges to composition of grand jury be made before trial constituted state waiver and, therefore, also constituted procedural default for purposes of federal habeas); *O'Sullivan*, 526 U.S. at 848-49 (failure to raise issue in

discretionary appeal to state supreme court constituted a procedural default for habeas purposes).

Procedural default will not be found based upon the failure to comply with the state procedural rule unless the state procedural rule is "adequate" and "independent." *Coleman*, 501 U.S. at 750. A state rule of procedure is "adequate" if it is firmly established and applied with some consistency. *Doctor*, 96 F.3d at 684 ("A state rule is adequate only if it is 'consistently and regularly applied.'") (citation omitted), *abrogated on other grounds by Beard*, 558 U.S. at 60-61 (holding that discretionary state rules can be adequate, contrary to *Doctor*). In addition, a state rule of procedure is "independent" if it does not depend for its resolution on answering any federal constitutional question. *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985) ("when resolution of the state procedural law question depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law"). Further, as set forth above, there are exceptions to the procedural default doctrine that would allow a federal habeas court to review an otherwise procedurally defaulted claim, namely (1) if the petitioner shows cause for, and actual prejudice stemming from, the procedural default, or (2) if the petitioner can establish a "miscarriage of justice." *See McCandless*, 172 F.3d at 260.

Turning to state law in the context of this procedural default, Pennsylvania applies a rule of waiver in multiple contexts. An issue not raised at trial or on direct appeal is waived and, *a fortiori*, a failure to file an appeal to the Superior Court at all waives the issues that could have been raised in that appeal. *See Commonwealth v. Mitchell*, 445 A.2d 721, 723 (Pa. 1982) (issues not raised on direct appeal are waived); *Commonwealth v. Agie*, 296 A.2d 741, 741 (Pa. 1972) ("We have consistently held that issues not raised in the court below are waived and cannot be raised for the first time on appeal to this Court.") (citations omitted).

Here, the court finds that Dierolf's failure to raise the remaining three sub-issues in his direct appeal constitutes waiver of the issues under state law. *See* Pa. R. App. P. 2116(a) (issue must be presented concisely in the statement of questions section of brief to appeals court in order to be considered); *Thomas v. Elash*, 781 A.2d 170, 176-77 (Pa. Super. Ct. 2001) ("Although Appellant may have preserved the issues raised in his post trial motions by mailing the motions within 10 days of the verdict, he has now waived those issues by failing to include them in his brief to this Court . . . . Having failed to properly raise and address the issues in his brief, Appellant has precluded our review of his substantive claims.") This state rule of waiver for failure to file an appeal or failure to raise an issue before the Superior

Court appears to be "independent" as it seeks only to ask whether the issue was raised in the Superior Court and hence does not involve any question of federal law. It also appears "adequate" as the rule was applied with sufficient consistency at the time of Dierolf's failure to raise the issues in a direct appeal, *i.e.*, October 2007, and has been, at least since 1996. *See, e.g.*, *Sistrunk v. Vaughn*, 96 F.3d 666, 671 n.4 (3d Cir. 1996) ("the rules [of Pennsylvania's appellate procedure] dictate that an issue raised at the trial level but not preserved on appeal will not be considered by any subsequent appellate court"); *Godfrey v. Patrick*, No. CIVA 05-1106, 2006 WL 3692598, at *11 (W.D. Pa. Dec. 12, 2006) ("Because this rule of waiver [for failing to raise an issue in the Superior Court] was consistently applied, at least since 1992 and thereafter up to the time Petitioner filed his appeal brief in the Superior Court, *i.e.*, October 29, 2003, it constitutes an 'adequate' state procedural rule for purposes of procedural default.") (footnote omitted). Thus, because Dierolf waived these sub-issues under state law by failing to raise them on direct appeal to the Superior Court and because this state rule of waiver is independent and adequate, Dierolf has procedurally defaulted these sub-issues for purposes of federal habeas review.

While it is true that ineffective assistance of counsel can, where there is a federal right to counsel, *see Martinez v. Ryan*, ____ U.S. ____, 132 S. Ct. 1309

23

(2012), serve as "cause" under the "cause and prejudice" exception so as to excuse the procedural default, the claimed ineffective assistance of counsel issue must itself not have been procedurally defaulted, *i.e.*, must have been properly raised in the state courts. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (holding that "an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted"). Here, Dierolf did not raise any issues of ineffective assistance of appellate counsel in the state courts. Thus, any such ineffectiveness claim could not serve as "cause" for the procedural default. In the absence of cause, the court will not address the issue of prejudice. Nor is Dierolf able to establish a miscarriage of justice if these sub-issues to this claim in his habeas petition are not considered by the court. There was overwhelming evidence of his guilt and, thus, he cannot establish his actual innocence of the crimes. *See supra*, page 11.

**B.     AEDPA Merits Review**

Once a court has determined that the exhaustion requirement is met, and therefore that review on the merits of the issues presented in a habeas petition is warranted, the scope of that review is set forth in 28 U.S.C. § 2254(d). That section states, in relevant part, that exhausted claims that have been adjudicated on the merits

by the state courts are subject to review under the standard of whether they are "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). AEDPA places the burden on the petitioner to make this showing. *Williams v. Taylor*, 529 U.S. 362 (2000).

The "contrary to" and "unreasonable application" clauses of § 2254 have independent meaning. *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court judgment is "contrary to" federal law when it is "diametrically different, opposite in character or nature, or mutually opposed" to "clearly established" decisions of the United States Supreme Court. *Williams*, 529 U.S. at 405. This may occur if "the state court ignores or misapprehends clear precedent or it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Wilkerson v. Klem*, 412 F.3d 449, 452 (3d Cir. 2005) (quoting *Williams*, 529 U.S. at 406). Alternatively, "[a]n 'unreasonable application' occurs when a state court 'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably

applies that principle to the facts' of petitioner's case." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Wiggins v. Smith*, 539 U.S. 510, 519, 520 (2003)). For purposes of § 2254(d)(1), "[i]t is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (internal citations omitted). "Under § 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 75-76, 123 S. Ct. 1166 (quoting *Williams*, 529 U.S. at 411). Rather, "[t]he state court's application of clearly established law must be objectively unreasonable" before a federal court may grant the writ. *Andrade*, 538 U.S. at 75, 123 S. Ct. 1166.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, § 2254(d)(1)'s "clearly established Federal law" signifies the holdings, not the dicta, of Supreme Court decisions. *Howes v. Fields*, ___ U.S. ___, ___, 132 S. Ct. 1181, 1187 (2012). Specifically, only Supreme Court law established at the time of the state court's

decision can be a basis for habeas relief under AEDPA. *See Green v. Fisher*, ___ U.S. ___, ___, 132 S. Ct. 38, 44 (2011) ("§ 2254(d)(1) requires federal courts to 'focu[s] on what a state court knew and did,' and to measure state-court decisions 'against this Court's precedents *as of* '*the time the state court renders its decision*.'") (quoting *Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S. Ct. 1388, 1399 (2011) (emphasis added)). Therefore, federal habeas review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, ___ U.S. ___, ___, 131 S. Ct. at 1398. Finally, "under the AEDPA standard, the '[s]tate court[s'] relevant factual determinations are presumed to be correct unless the petitioner rebuts [that] presumption by clear and convincing evidence.'" *McBride v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 101 (3d Cir. 2012) (quoting *Han Tak Lee v. Glunt*, 667 F.3d 397, 403 (3d Cir. 2012)) (citing 28 U.S.C. § 2254(e)(1)).

Turning to § 2254(d)(2), the test for the "unreasonable determination of facts" clause is whether the petitioner has demonstrated by "clear and convincing evidence," § 2254(e)(1), that the state court's determination of the facts was unreasonable in light of the record. *Rountree v. Balicki*, 640 F.3d 530, 537 (3d Cir. 2011) (citing *Rice v. Collins*, 546 U.S. 333, 338-339, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden

of rebutting the presumption by 'clear and convincing evidence.'") (quoting §

2254(e)(1)) (citing *Miller-El v. Dretke*, 545 U.S. 231, 240, 125 S. Ct. 2317, 162 L.

Ed. 2d 196 (2005)); *see also Simmons v. Beard*, 590 F.3d 223, 231 (3d. Cir. 2009)

("Under the § 2254 standard, a district court is bound to presume that the state court's

factual findings are correct, with the burden on the petitioner to rebut those findings

by clear and convincing evidence."). Further, as with § 2254(d)(1), the evidence

against which a federal court measures the reasonableness of the state court's factual

findings is the record evidence at the time of the state court's adjudication. *Rountree*,

640 F.3d at 538 (citing *Cullen*, ___ U.S. at ___, 131 S. Ct. at 1401-03).

"If this standard is difficult to meet, that is because it was meant to be."

*Harrington v. Richter*, ___ U.S. ___, ___, 131 S. Ct. 770, 786 (2011). Section

2254(d) "preserves authority to issue the writ in cases where there is no possibility

fairminded jurists could disagree that the state court's decision conflicts with

[Supreme Court] precedents. It goes no farther." *Id*. Further, it was designed to be

difficult "to ensure that state-court judgments are accorded the finality and respect

necessary to preserve the integrity of legal proceedings within our system of

federalism." *Martinez*, 132 S. Ct. at 1316.

Finally, AEDPA scrutiny is applicable only if the state court adjudicated the petitioner's claims "on the merits." 28 U.S.C. § 2254(d); *see Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). " An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Rompilla v. Horn*, 355 F.3d 233, 247 (3d Cir. 2004), *rev'd on other grounds, Rompilla v. Beard*, 545 U.S. 374 (2005) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001)). Further, an "adjudication on the merits" can occur at any level of state court. *Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009). However, "to qualify as an 'adjudication on the merits,' the state court decision must finally resolve the claim. This means that the state court's resolution of the claim must have preclusive effect." *Id*. (citing *Rompilla*, 355 F.3d at 247 (quoting *Sellan*, 261 F.3d at 311)). Where a state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential AEDPA standards do not apply, and the federal court must exercise *de novo* review over pure legal questions and mixed questions of law and fact. *Simmons v. Beard*, 581 F.3d 158, 165 (3d Cir. 2009) (citing *Appel*, 250 F.3d at 210). However, the state court's factual determinations are

still presumed to be correct, rebuttable upon a showing of clear and convincing

evidence.[4]  *Simmons*, 581 F.3d at 165 (citing *Appel*, 150 F.3d at 210).

### 1.    Claim One - Ineffective Assistance of Counsel

Respondents concede that Dierolf has exhausted his Claim One, which contains

six sub-issues.[5]  In those sub-issues, Dierolf claims that trial counsel was ineffective:

(1) for not objecting to references to Dierolf's post-arrest silence; (2) for not

challenging the testimony of the Commonwealth's medical expert; (3) for stating

during closing argument that he did not like Dierolf; (4) for not objecting to the

testimony of Dierolf's wife; (5) for not objecting to the Commonwealth's reference to

evidence of saliva; and (6) for not objecting to evidence of prior statements by

witnesses.  Prior to discussing these claims, the court will set forth the standard for

ineffective assistance of counsel.

A claim for ineffective assistance of counsel is governed by the standard set

forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  A habeas petitioner asserting

---

[4] In fact, "the § 2254(e)(1) presumption of correctness applies regardless of whether there has been an 'adjudication on the merits' for purposes of § 2254(d)."  *Thomas*, 570 F.3d at 116 (quoting *Nara v. Frank*, 488 F.3d 187, 200-01 (3d Cir. 2007)).

[5] Dierolf's Claim One set forth in his petition contains eight sub-issues, but he briefs only the first six in his memorandum of law.  (*See* Doc. 1; Doc. 11.)  As sub-issues seven and eight are essentially covered by the other six sub-issues, the court will discuss only sub-issues one through six.

a claim under *Strickland* must establish two elements. "First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. In evaluating counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy." *Id*. at 689 (citation omitted). Thus, counsel's performance will be deemed deficient only if it "fell below an objective standard of reasonableness." *Id*. at 688. Further, "[i]n assessing counsel's performance, 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. There is a 'strong presumption' that counsel's performance was reasonable." *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001) (alteration in original) (citations and quotations omitted). Counsel cannot be deemed ineffective for failing to raise a meritless claim. *See United States v. Saunders*, 165 F.3d 248, 253 (3d Cir. 1999). The question ultimately is "whether, in light of all the circumstances, the [challenged] acts or omissions were

outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

If a petitioner establishes deficient performance, he must then establish prejudice. "Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id*. at 687. To establish prejudice, "[t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

Further, in analyzing an ineffectiveness of counsel claim, the *Strickland* court made clear that a court does not need to address both components of the inquiry if the petitioner has failed to make a sufficient showing on one. "In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id*. at 697.

The two-prong test for ineffective assistance of counsel as established by *Strickland* "qualifies as 'clearly established Federal law'" for purposes of AEDPA. *Rainey v. Varner*, 603 F.3d 189, 197 (3d Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 391 (2000)).[6] Thus, under § 2254(d)(1), the relevant inquiry in assessing ineffectiveness claims that have been adjudicated on the merits is whether the state court's decision involved an unreasonable application of *Strickland* or is based on an unreasonable determination of the facts. *Jacobs v. Horn*, 395 F.3d 92, 107 (3d Cir. 2005); *Werts v. Vaughn*, 228 F.3d at 178, 204 (3d Cir. 2000).

### a.      Post-Arrest Silence

Dierolf claims that his trial counsel was ineffective for failing to object to the prosecutor's references, during her cross-examination of Dierolf and during her closing argument, to Dierolf's post-arrest silence. Upon review, the court finds that Dierolf is not entitled to relief on this claim.

Dierolf raised this claim before the PCRA court, and the court denied it. As a result, the Pennsylvania Superior Court addressed the claim in its September 24, 2010

---

[6]   The standard under Pennsylvania law for ineffective assistance of counsel is consistent with the two-prong *Strickland* analysis. *See Commonwealth v. Pierce*, 527 A.2d 973, 976-77 (Pa. 1987).

decision affirming the PCRA court's decision. In doing so, the court considered the

following exchange between Dierolf and the prosecutor:

> Q:   You made up this story about her masturbating you once you
>       realized that there was physical evidence of the assault, didn't
>       you?
>
> A:   No, I did not.
>
> Q:   But you didn't give this story to the police when you were
>       questioned by them; Is that correct?
>
> A:   No, I did not.
>
> Q:   In fact, this is the first time that the Commonwealth and the jurors
>       are hearing this story; is that correct?
>
> A:   Yes, it is.
>
>                           . . .
>
> Q:   Is it your testimony then that the way that the semen - your semen
>       got into the crotch of her underwear was because after she finished
>       masturbating you, some semen got on her hand and then she
>       adjusted herself?
>
> A:   Yes.
>
>                           . . .
>
> Q:   But you didn't tell the police that; is that correct?
>
> A:   No, I did not. I was scared.
>
>                           . . .

Q:     But you were already arrested and charged for a more serious
       allegation than having your 14-year old niece masturbate you.  So
       why didn't you tell them then?

A:     I did not have an attorney at the time, and I didn't say anything.  I
       was scared.  Once I was arrested, I hired an attorney.

N.T., Trial, 1/17/07, at 243, 246.

(Doc. 15-8 at 7-8, *Commonwealth v. Dierolf*, No. 1050 MDA 2009 (Pa. Super. Ct.

May 22, 2009.)  In addition, the Superior Court considered the following statement by

the prosecutor at closing argument:

It's a story.  It's not the truth.  It's not facts.  It's a story that the
Defendant fabricated.  And when did he do this?  Because he didn't tell
the police when he was voluntarily interviewed by them. [sic] He didn't
tell the police this story.  In fact, it wasn't until court today that he got up
and he said this story after he realized that he needed to explain how his
semen was on the inside crotch of her underwear.

(*Id*. at 8-9.)

Having considered this record evidence, the Superior Court first found no

ineffective assistance of counsel based on its determination that there was a

reasonable basis for trial counsel's trial strategy with respect to Dierolf's post-arrest

silence.  Specifically, the court reasoned:

Although the Commonwealth concedes that trial counsel should
have objected pursuant to [*Commonwealth v.*] *Turner*[, 454 A.2d 537
(1982) (finding reference at trial to post-arrest silence to be a violation of

35

a defendant's right to due process)] (*see* Commonwealth's Brief, at 4), our review of the record reveals that there was a reasonable basis for trial counsel's strategy. Moreover, the Commonwealth argues, and we agree, that Dierolf was not prejudiced by trial counsel's lack of objection because it did not contribute to the verdict and was therefore harmless. *See id.*, at 4-5.

In this context, trial counsel indicated that Dierolf's trial testimony that he only had the victim masturbate him "was a lie," and was "very inconsistent" with the story Dierolf had told police prior to his arrest. N.T., PCRA Hearing, 5/22/09, at 11-12. Therefore, trial counsel gave Dierolf strict instructions not to say anything about the case leading up to trial. *See id.*, at 12. He believed that the case would be based upon the victim's credibility versus Dierolf's credibility, and he wanted Dierolf to state that he initially went to the police and gave a statement, but then once he had a lawyer he was simply following his instructions to remain silent. *See id.*, at 12-13. When asked if it was his trial strategy to allow the prosecutor to make repeated references to Dierolf's post-arrest silence, trial counsel responded, "No. I didn't believe it was prejudicial if he would have responded the way we discussed." *Id.*, at 13. When asked why he ran that risk, trial counsel responded:

> [I]n retrospect, after the first time, I probably should have objected for various reasons. But, again, my strategy was with the overwhelming physical evidence that the Commonwealth had with the victim's - with my client's DNA sperm and saliva in her panties and the conflicting testimony of the victim on numerous, numerous occasions, I had to make sure that my client appeared honest to the jury.

*Id*.

After reviewing the record, in light of the Commonwealth's overwhelming evidence against Dierolf, trial counsel utilized a sound strategy because he reasonably believed that the case would turn on the victim's credibility versus Dierolf's. Therefore, he wanted to make

Dierolf's story appear as believable as possible. For instance, although Dierolf claims that the victim lied about the rape, he conceded that there was inappropriate sexual contact between himself and the victim on the night in question. *See id.*, at 61. It was undisputed that Dierolf's semen was found on the inside crotch lining of the victim's underwear. *See id.* Although Dierolf maintained that his semen got on the victim's hand after she masturbated him, and then it must have been deposited on her underwear when she adjusted it with the same hand, the jury clearly discredited this testimony. *See id.*, at 62.

In order to make Dierolf's story as believable as possible to the jury, trial counsel reasonably determined that objecting to references to his post-arrest silence would make him seem less honest. Thus, we find that not objecting to the prosecutor's references to his post-arrest silence was a reasonable trial strategy under the circumstances.

(Doc. 15-8 at 9-11.)

In reviewing this claim that trial counsel was ineffective for failing to object to the prosecutor's references to Dierolf's post-arrest silence, the court initially considers the following with respect to the constitutional right to silence. In *Doyle v. Ohio*, 426 U.S. 610 (1976), the United States Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Greer v. Miller*, 483 U.S. 756, 762 (1987) (quoting *Doyle*, 426 U.S. at 619). Once a criminal defendant receives *Miranda* warnings, "it is improper under *Doyle* 'for a prosecutor to cause the jury to draw an impermissible inference of guilt from a

defendant's post-arrest silence.'" *Gov't of Virgin Islands v. Martinez*, 620 F.2d 321, 335 (3d Cir. 2010). "Not every reference to a defendant's silence, however, results in a *Doyle* violation." *Id*.

As stated above, the Superior Court in this case found that there was a reasonable basis for trial counsel's strategy, which involved, in part, not objecting to the prosecutor's references to Dierolf's post-arrest silence. In his habeas petition, Dierolf argues that that conclusion is unsound because the prosecutor's references, in effect, violated his fundamental rights and asked the jury to find him guilty. (Doc. 11-1 at 12.) As a result, Dierolf argues, trial counsel's failure to object "cannot reasonably be characterized in any manner as being part of a 'legitimate' defense strategy." (*Id*.)

Under AEDPA, this court's review of this claim of ineffective assistance of counsel asks whether the Superior Court's determination that trial counsel possessed a reasonable trial strategy under the circumstances "was so lacking in justification that there was an error well understood and comprehended in existing [Supreme Court precedent] beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87.

Here, at the PCRA hearing, trial counsel testified extensively as to his trial strategy with respect to Dierolf's testimony at trial. Initially, he stated,

> Part of my strategy was to show the jury that my client was honest and open and cooperative from the beginning when [the prosecutor] questioned him. What he did say - - and I wanted to push him more on this questioning - - was, in the police report, that immediately after he learned of these incidents, these allegations, he went to the Larksville police voluntarily; voluntarily waived his *Miranda* rights and gave a written statement. And these were done as soon as his wife called him by phone and said that the victim was making allegations. I wanted him to answer that he did go to the police; he cooperated in all regards. And he did not do that on the stand.

(Doc. 15-5 at 5, PCRA Hearing, 5/22/09.) Regarding his strategy, trial counsel also stated, "this case was going to be based on credibility. It was the victim's credibility versus the Defendant's credibility. And I wanted him to state that he initially did go to the police. And then once he had a lawyer, he was following his lawyer's instructions." (*Id*.) In response to the inquiry related to the repeated references to the post-arrest silence by the prosecutor, trial counsel stated,

> [I]n retrospect, after the first time, I probably should have objected for various reasons. But, again, my strategy was with the overwhelming physical evidence that the Commonwealth had with the victim's - with my client's DNA sperm and saliva in her panties and the conflicting testimony of the victim on numerous, numerous occasions, I had to make sure that my client appeared honest to the jury.

(*Id*.)  And, with respect to his failure to object during the prosecutor's closing argument, trial counsel stated, "[M]y normal trial strategy is I do not object during a prosecutor's closing unless it's extremely prejudicial because by doing so, it brings to the attention of the jury that issue so the jury believes that something must really be there for counsel to object during the closing."  (*Id*. at 6.)  Finally, with respect to any of the references, trial counsel repeatedly stated that he did not believe they were prejudicial to Dierolf.  (*Id*. at 5-7.)

The Superior Court, considering trial counsel's testimony at the PCRA hearing, found that trial counsel "utilized a sound strategy because he reasonably believed that the case would turn on the victim's credibility versus Dierolf's," (Doc. 15-8 at 10), and "reasonably determined that objecting to references to [Dierolf's] post-arrest silence would make him seem less honest," (*id*. at 11), factual findings that this court is bound to presume correct because Dierolf has not rebutted them with clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).  Even though trial counsel's strategy proved ultimately unsuccessful, this court must "eliminate the distorting effects of hindsight," and "indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689.  Recognizing that "the standards created by *Strickland* and § 2254(d) are

both highly deferential, and when the two apply in tandem, [our] review [should be] doubly so," there is a "reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 131 S. Ct. at 788 (internal citations and quotation marks omitted). Accordingly, the court finds that the Pennsylvania Superior Court's determination that trial counsel had a reasonable basis for his trial strategy with respect to the references to Dierolf's post-arrest silence was not an unreasonable application of *Strickland*.

Turning to the Superior Court's other finding with respect to this issue of references to Dierolf's post-arrest silence, that court concluded that any objections by trial counsel would not have changed the outcome of the case and therefore the failure to object was harmless. Specifically, the Superior Court reasoned as follows:

> In any event, we agree with the Commonwealth's assessment that objections by trial counsel would not have changed the outcome of the case. Dierolf's saliva was discovered on the victim's underwear as well as his semen, which corroborates the victim's story that he performed oral sex on her before he raped her. *See id.*, at 51. We remind Dierolf that the victim's testimony, as clearly credited by the jury, that "he put his penis in me and then went back and forth," (N.T., Trial, 1/16/07 - 1/18/07, at 63), would, by itself, be a sufficient basis for us to conclude that he is guilty of rape beyond a reasonable doubt. *See Commonwealth v. Charlton*, 902 A.2d 554, 562 (Pa. Super. 2006) (stating that the uncorroborated testimony of a victim of a sexual crime, if believed by the trier of fact, is sufficient to convict a defendant despite contrary evidence from defense witnesses).

(Doc. 15-8 at 11.)

On collateral review of a state court criminal judgment, a habeas court does not defer to the state court's harmless-error analysis. Rather, a habeas court is required to assess the prejudicial impact of a constitutional error at trial under the *Brecht* standard, which provides that a constitutional error is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The Third Circuit has explained the *Brecht* standard as follows:

> Under the *Brecht* standard, "habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." *Bond* [*v. Beard*], 539 F.3d [256,] 276 [(3d Cir. 2008)] (quoting *Brecht*, 507 U.S. at 637, 113 S. Ct. 1710). "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless." *Id*. (quoting *O'Neal v. McAnnich*, 513 U.S. 432, 436, 115 S. Ct. 992, 130 L.Ed.2d 947 (1995)).

*Sanders v. Klem*, 341 F. App'x 839, 843 (3d Cir. 2009).

As stated herein, in order to warrant habeas relief, Dierolf must show actual prejudice under the *Brecht* standard. Having reviewed the state court record in this case, the court concludes that the evidence pointing to Dierolf's guilt, which included the victim's credible testimony as well as physical evidence of the crimes charged

42

found on the victim's underwear, was "if not overwhelming, certainly weighty." *See*

*Brecht*, 507 U.S. at 639.  Based on this record, the court finds that the references to

Dierolf's post-arrest silence did not have a substantial and injurious effect or

influence on the jury's verdict.  Thus, Dierolf is not entitled to habeas relief on this

claim.  Furthermore, Dierolf is also not entitled to habeas relief on his claim of trial

court error relating to these references to post-arrest silence. *See supra*, Section

II.A.3, at 16-20.

### b.  Challenge to Commonwealth Medical Expert Testimony

Next, Dierolf claims that his trial counsel was ineffective for failing to object to

the testimony of the Commonwealth medical expert who explained the results of a

medical examination performed on the victim.  He also claims that trial counsel was

ineffective for failing to produce a competing medical expert to impeach the

testimony of the Commonwealth's expert.  Dierolf raised this claim before the

Superior Court in his appeal from the denial of his PCRA petition.  However, in its

decision affirming the denial of the PCRA petition, the Superior Court deemed this

claim waived, and thus did not address it on the merits.  As a result, the court will

review this claim *de novo*.  *See Simmons*, 581 F.3d at 165.  Upon that review, the

court finds that Dierolf is not entitled to relief on this claim.

The background of this claim is as follows.  At trial, the Commonwealth presented the testimony of Linda Thomas-Heamak, M.D., an internal medicine and pediatric primary care doctor with expertise in child physical and sexual assault cases. (Doc. 12-1 at 10-15, N.T. Trial, 1/16/2007.)  On direct examination, Dr. Thomas-Heamak testified that she performed a complete physical examination of the victim, including a gynecological examination.  (*Id*. at 11.)  Upon examination, Dr. Thomas-Heamak concluded that the victim's hymen was estrogenized, or intact, with no evidence of trauma.  (*Id*.)  However, she explained that "a normal estrogenized menarchial hymen can often accommodate any kind of penetration without evidence of trauma being left."  (*Id*.)  Referencing an unidentified medical research study, she stated, "It is well established in the abuse literature that a normal examination does not preclude abuse particularly in the presence of a clear, spontaneous and reproducible history."  (*Id*. at 12.)  She also added, "The hymen is an accommodating estrogenized retractile organ that often is not injured or traumatized with sexual activity."  (*Id*. at 14.)

On cross-examination, Dierolf's trial counsel repeatedly questioned Dr. Thomas-Heamak about her report containing the victim's account of the incident, which was inconsistent with the victim's prior testimony at trial.  (*Id*. at 12-14.)

Through questioning of this witness, he also established that there was no evidence of intercourse, no tears in the vaginal canal, no semen in the vaginal canal, no scarring on the labia, and no foreign pubic hairs. (*Id*. at 14.) Trial counsel did not, however, present the testimony of a medical expert to counter the findings of Dr. Thomas-Heamak.

At the PCRA hearing, trial counsel and Dierolf's PCRA counsel had the following exchange with respect trial counsel's strategy for cross-examining Dr. Thomas-Heamak:

> Q: Now, would it be fair for me to say that prior to the commencement of the trial, that you certainly knew what the medical records did or did not disclose as far as a physical examination of [the victim] the day after the election of an exam?
>
> A: I knew about it; it was the bulk of my case.
>
> * * *
>
> Q: And you knew that the Commonwealth had properly disclosed to you during discovery that based upon the facts and circumstances of the medical examinations of - - medical examination of [the victim], that Dr. Heamak intended to testify that that examination was consistent with sexual intercourse having occurred?
>
> A: I didn't know what her testimony was going to be in advance, but I assumed that's what she was going to testify to. That's why the Commonwealth was calling her.
>
> * * *

45

Q:     Based upon the results of the examination and based upon your understanding of Mr. Dierolf's testimony that their sexual intercourse never occurred, did you believe that that disputed issue represented an important aspect of this case?

A:     What disputed issue?

Q:     That whether or not sexual intercourse had occurred?

A:     All the medical records that I reviewed and the witness testified to showed that there was no penetration. And the Defendant was charged with four different counts of sex crimes involving penetration. And our defense was that there was no penetration; that the DNA semen got on her panties by ejaculation when she masturbated him.

* * *

The medical records, including that witness you're talking to, testified the hymen was intact; that there was no vaginal tears; that there was no semen in the vaginal canal; there was no signs of trauma; and there was no pubic hair by - - the Defendant's pubic hair anywhere on her body. So it was consistent. And our strategy was that there was no penetration.

* * *

Did I assume that [the medical expert] would testify that sexual intercourse occurred? Yeah, that's why they called her. But I had impeaching evidence to show that it did not occur because of the statements I just made to you - - the lack of any tearing; the hymen being intact.

Q:     Besides your cross examination, Mr. Pendolphi, what other impeaching evidence did you produce?

A: The inconsistent statements of the victim herself.

Q: I'm talking about the physical exam. The Commonwealth provided and produced an expert medical witness who testified that the genitalia of [the victim] was intact.

A: Correct.

Q: That there was no evidence of penetration, no evidence of trauma, everything that you just said. My question to you is: What, if any, efforts did you consider or did you make to produce testimony or any other evidence that would contradict the testimony of the Commonwealth medical expert?

A: The other evidence was the Defendant's testimony and the victim's testimony.

(Doc. 15-5 at 8, N.T. PCRA Hearing, 5/22/2009.)

Also at the PCRA hearing, Dierolf's PCRA counsel presented the testimony of Alan Pinshaw, M.D., an expert in obstetrics, gynecology, and reproductive biology. (*Id*. at 18-21.) Dr. Pinshaw testified that, to a reasonable degree of medical certainty, there was no penetration at the time of the incident. (*Id*. at 21.) In relation to this testimony, counsel had the following exchange regarding the hiring of a medical expert to counter the testimony of Dr. Thomas-Heamak at trial:

A: I would have loved to have my own expert come up and contradict the Commonwealth. The problem with that was - - is that Mr. Dierolf, I discussed it with him, had no money. He couldn't afford to pay for an expert. I wanted to be able to challenge the DNA, and we couldn't do that.

47

Q:  Did you ever present to Mr. Dierolf your opinion or advice that a competing medical expert be obtained?

A:  I talked to him about many experts that we needed.  I wanted him to hire a private investigator.  He was able to raise some small funds.  The fact of the matter is he didn't have the money for this.  I think I recall telling him he could go to the public defender, and if he qualified, they'd be able to provide for services.  But he didn't have the money to hire an expert.  The main thing, if I could explain, the main evidence against Mr. Dierolf was the presence of the DNA, of his DNA sperm.  And I told him, as a trial lawyer, there's only two things I could do - - attack it or account for it.

* * *

Q:  Did you do any independent research, Mr. Pendolphi, without hiring a medical expert, to review the legitimacy of the opinions expressed in that pediatrics article, or to find out if there was any articles that you could find to cross-examine Dr. Heamak on the foundation of her expert opinion?

A:  I don't know if I did.  I might have talked to some doctor friends about it, about some terminology I didn't understand.  But when I looked at the article and I knew what the strategy of my case was, knowing she was going to come up with sexual intercourse anyway, her other statements regarding what I talked to you about was very overwhelming.  I thought that I'd be able to convince a jury, and that's what my strategy was, to concentrate on those pivotal points; That how could there be penetration by my client if this woman's hymen is intact and there's no sperm and there's no vaginal tears and there's no signs of trauma and there's no pubic hairs.  I thought that would make a convincing argument to the jury, but it didn't happen.

Q:  Did you make any effort to dispute, other than the results of the examination, did you make any other effort on behalf of Mr.

48

Dierolf to dispute the medical theoretical foundation of Dr. Heamak's testimony?

A:     No, I didn't.  I was happy I got the point out of her as I wanted. You know the rule when you're cross-examining an expert and you don't have the expertise in.  I got the points that I wanted out of her testimony.  I got in, and I got out as quickly as I could.

(*Id*. at 8-9.)

In this claim, Dierolf first claims that trial counsel was ineffective for failing to object to the testimony of Dr. Thomas-Heamak.  More specifically, Dierolf claims that counsel, in his cross-examination, should have pushed the Commonwealth expert to support her medical opinions with respect to penetration and an intact hymen. Decisions by trial counsel with regard to examination of witnesses are strategic by nature and necessitate a strong level of deference to the attorney's assessment.  *See Diggs v. Owen*, 833 F.2d 439, 444-45 (3d Cir. 1987).  Here, at the PCRA hearing, trial counsel stated that it was his strategy to show that penetration never occurred, and thus the victim was not being truthful.  Indeed, during his cross-examination of Dr. Thomas-Heamak, counsel was able to establish that there was no evidence of intercourse, no tears or semen in the vaginal canal, no scarring on the labia, and no foreign pubic hairs.  Counsel testified later that it was his strategy to concentrate on these pivotal points suggesting no penetration, and that by doing so he was making a

convincing argument to the jury. He also testified that his decision not to press Dr. Thomas-Heamak on her medical theoretical foundation was a strategic one, stating, "I got the points that I wanted out of her testimony. I got in, and I got out as quickly as I could." (Doc. 15-5 at 9.) This decision does not demonstrate a deficiency in trial performance; rather, it shows counsel trying to minimize the damage the Commonwealth's direct testimony would have on Dierolf's case. Thus, because the lack of an objection by counsel was based on a well-reasoned, strategic decision, counsel was not ineffective here. Dierolf is not entitled to habeas relief on this claim.

Turning to Dierolf's claim that trial counsel was ineffective for failing to call an expert to refute Dr. Thomas-Heamak, the court concludes that Dierolf has failed to overcome the strong presumption that counsel's decision not to call an expert was the result of sound trial strategy. *See Strickland*, 466 U.S. at 689. Initially, the court notes that there is no *per se* rule that trial counsel seek out an expert. Further, while an expert did refute Dr. Thomas-Heamak at the PCRA hearing, the trial record shows that, without the benefit of such testimony, trial counsel did reasonably attempt to discredit the Commonwealth expert. Specifically, trial counsel engaged in a vigorous cross-examination of Dr. Thomas-Heamak in which he elicited testimony from her that there was no evidence of intercourse, no tears or semen in the vaginal canal, no

scarring on the labia, and no foreign pubic hairs. As such, it appears that trial counsel was prepared to refute the expert's testimony on penetration with his own cross-examination. And, while counsel stated at the PCRA hearing that he would have preferred to present a competing expert, his client was not willing or able to pay for such an expert. As a result, it is clear that counsel altered his trial strategy to accommodate the inability to present a competing expert by focusing on a sound cross-examination of the Commonwealth's witness. In light of the trial record, as well as trial counsel's PCRA testimony with respect to his trial strategy here, the court finds that Dierolf has failed to overcome the strong presumption that trial counsel's decision not to call an expert witness to refute Dr. Thomas-Heamak was the result of sound trial strategy. *See Strickland*, 466 U.S. at 689. Thus, Dierolf is not entitled to habeas relief on this claim.

### c.      **Trial Counsel's Closing Argument Remarks**

Next, Dierolf claims that his trial counsel was ineffective for stating during his closing argument that he did not like Dierolf. Dierolf raised this claim before the Superior Court in his appeal from the denial of his PCRA petition. However, in its decision affirming the denial of the PCRA petition, the Superior Court deemed this claim waived, and thus did not address it on the merits. As a result, the court will

review this claim *de novo*.  *See Simmons*, 581 F.3d at 165.  Upon that review, the

court finds that Dierolf is not entitled to relief on this claim.

The background of this claim is as follows.  At trial, Dierolf's trial counsel

made several remarks about his feelings towards Dierolf.  Specifically, in his opening

statement, trial counsel stated the following:

> Throughout the course of this trial, and by the end of this trial, you're not
> going to like Bill Dierolf.  You're not going to like Mr. Dierolf.  It's
> human nature because obviously something transpired and obviously
> something transpired that was inappropriate.  What's why we're here.

> But you're going to have to ask yourself, because you swore an oath, you
> swore an oath.  Is not liking Bill Dierolf enough to convict him for
> Felony 1 rape and Felony 1 involuntary deviate sexual intercourse and
> sexual assault and statutory sexual assault?

(Doc. 12 at 13, N.T. Trial, 1/16/2007.)  During his closing argument, trial counsel

stated to the jury:

> And you're human.  It is human nature, and we all understand it, that
> none of you - - and I told you in my opening, none of you will like Bill
> Dierolf at this point after he got up there and testified as to what really
> happened.  None of you like him.  You know what?  Quite frankly, to be
> honest, I don't like him, either.

> * * *

> You're human.  It is all right not to like him.  I'm his lawyer.  I don't like
> what he did, but we can't change the fact of what happened is what
> happened.

(Doc. 12-2 at 18, N.T. Trial.)

At the PCRA hearing, trial counsel answered the following questions posed by Dierolf's PCRA counsel with respect to trial counsel's remarks about Dierolf to the jury during trial:

Q:    Why did you say ["I don't like him" comments]?

A:    Perfectly consistent with my strategy.

Q:    What strategy was that?

A:    Because we had to account for how the DNA was in her panties. The most important evidence the Commonwealth had was that my client's sperm DNA was in her panties. . . .   And we knew that he was going to testify, to state that she masturbated him and when he ejaculated, semen got on her hand.  And then she fixed her panties, and that's where the transference of evidence got in.  My client is going to get on the witness stand, and he was going to be a 25-year-old who raped, allegedly raped, a 14-year-old niece . . . while his wife was in the hospital giving birth to his child.  That jury wasn't going to like him.  They never charged him with any sexual-related crimes that were nonpenetration.  So if they believed that, how the semen got there, my point in my argument was: You're not gonna like what he did because I don't like what he did.  A 28-year-old man shouldn't get masturbated by his 14-year-old niece while his wife is giving birth.  So if I could convince them that not liking him was not enough to convict him of those four penetration crimes, that would be an acquittal.  I didn't want them to not like him and find him guilty because they didn't like him.  So I was going to try[ ] to take air out of the balloon and prepare him in advance.

* * *

53

Q:    In your answer to my preceding question, you indicated that it was
      clear that the jury may not appreciate the offense that occurred,
      according to Mr. Dierolf's testimony.  Right?

A:    Correct.

Q:    And I will concede for purposes of this petition . . . that it was a
      legitimate trial strategy to try to minimize or to try to take that
      position with the jury.  But my question to you is: Separate and
      apart from doing that, why did you - - what was your trial strategy
      to make it personal on his character?

A:    I wasn't making it personal on his character.  My client's story to
      me was consistent from the moment he walked into my office from
      my initial consultation . . . - - through all of our meetings, through
      the meeting for preparing his testimony, that he would let his 14-
      year-old niece masturbate him.  And that was our case.  He never
      changed his story, not even up through sentencing; I wasn't there.
      That jury wasn't going to like him.  I didn't want them going back
      there thinking is not liking this guy enough, enough to convict him
      of rape if the Commonwealth didn't prove penetration.  I wasn't
      going to sugar-coat it.  I told them, You're not gonna like him.  I
      don't like what he did.  It's disgusting.  It's repulsive.  If you
      believe his testimony, what he did to his niece, is repulsive.  That
      jury, their human nature, says, as you heard in my closing, they are
      going to be repulsed.  But I didn't want the repulsiveness to be
      enough to convict him of rape.  And I wanted them to think about
      that when they went to deliberate.  I think it was a very good
      strategy.

Q:    And what part of that very good strategy, according to your trial
      tactics, did you receive by telling the jury that although they may
      not like him, that you, his lawyer, doesn't like him?

A:     Very easy.  You heard me read the transcript.  I said, We're all human, including this lawyer.  And as his lawyer, I represented him to the best of my ability.  And did I like what he did?  No, I'm not gonna let the jury think I like him; and that this man let this woman masturbate him.  I wanted them to relate to me as part of my trial strategy: I'm one of you; you're one of me.  We don't like what he did.  We may not like him, but it's not enough to convict him of rape if the evidence isn't there.

Q:     Mr. Pendolphi, is it your testimony in response to my questions that the use of the phrase "I don't like what he did" and the words "I don't like him" are the same?

A:     Probably not the same.  But knowing what Bill Dierolf did, I represented him zealously to the best of my abilities under the law and ethics.  Does that mean I would like him after what he did?  Would I go out for a beer with him? Absolutely not.  But it had no basis on my ability to represent him as his trial lawyer.  That was a very good trial strategy to diffuse the disgustingness (sic) that that jury was going to think about him when they heard him say he let his 14-year-old masturbate him to the point of ejaculation, Counsel, and I had to take that away.  And that was the best thing I could do to take it away, make them feel human.  It's not unnatural to not like a man because he let his niece masturbate him while his wife is giving birth in the hospital.  That's not enough to convict him.

(Doc. 15-5 at 9-10, N.T. PCRA Hearing, 5/22/2009.)

     In this claim, Dierolf contends that trial counsel was ineffective during his closing argument when he stated that he did not like his client.  He claims that the statement was a personal attack, disloyal, unnecessary, and served only to prejudice the jury against him.  In light of *Strickland*'s strong presumption that counsel's

strategic decisions were the result of "reasonable professional judgment," *Strickland*, 466 U.S. at 690, the Third Circuit has counseled that it is "only the rare claim of ineffectiveness of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance," *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989). Only where the "deficiencies in counsel's performance are severe and cannot be characterized as the product of strategic judgment" will deficient performance be found. *Id.*

No such "severe" deficiency occurred during trial counsel's closing argument. Initially, it is clear that throughout his closing, trial counsel was standing by Dierolf's account of the incident, and therefore was not disloyal. However, that account, as Dierolf testified at trial, was that he did engage in sexual activity with his 14-year old niece, but not the activity for which he was charged. Undoubtedly, after hearing Dierolf's testimony, it was reasonable for counsel to believe that the jury did not like him. Therefore, trial counsel's attempt to relate to the jury ("I'm one of you; you're one of me. We don't like what he did." (Doc. 15-5 at 10)), was part of a reasonable strategy that entailed explaining to the jury that not liking his client was understandable, but not a reason to convict him. Further, while Dierolf believes that trial counsel should have made "alternate arguments" to frame an attack on the

Commonwealth's case, (Doc. 11-2 at 5), it is precisely this type of post-conviction second-guessing that *Strickland*'s standard is intended to prevent. *See Strickland*, 466 U.S. at 689. As the Supreme Court noted in *Strickland*, "effective assistance" encompasses countless different strategies and tactics; "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id*. Dierolf's suggestion, then, that "alternate arguments" would have been superior, where trial counsel's own closing argument was the clear result of strategic thinking in light of what was presented at trial by way of Dierolf's own testimony, cannot give rise to a finding of deficient performance. As such, Dierolf has failed to demonstrate that trial counsel's statements regarding his dislike for Dierolf constituted ineffective assistance of counsel. Thus, Dierolf is not entitled to habeas relief on this claim.

### d. Testimony of Dierolf's Spouse

Next, Dierolf claims that his trial counsel was ineffective for failing to object to the testimony of Dierolf's wife at trial. Dierolf raised this claim before the Superior Court in his appeal from the denial of his PCRA petition. However, in its decision affirming the denial of the PCRA petition, the Superior Court deemed this claim waived, and thus did not address it on the merits. As a result, the court will review

this claim *de novo*. *See Simmons*, 581 F.3d at 165. Upon that review, the court finds that Dierolf is not entitled to relief on this claim.

The background of this claim is as follows. As part of its case-in-chief, the Commonwealth presented the testimony of Dierolf's wife, Lisa Dierolf. (Doc. 12-1 at 1-4, N.T. Trial, 1/16/2007.) On direct examination, Mrs. Dierolf testified as to the demeanor of the victim on the day after the incident. (*Id*. at 1.) She stated that when the victim and Dierolf came to visit her in the hospital that day, the victim "wasn't talking. Something was wrong. She wasn't talking. [She] wouldn't eat." (*Id*.)

On cross-examination, Dierolf's trial counsel first asked Mrs. Dierolf if she had told her mother-in-law that she did not want the victim to go to her house while she was in the hospital. (*Id*. at 2.) Mrs. Dierolf responded, "I told her I didn't like the idea of him taking the girls, any girls, alone. It's not normal in my opinion. Why would he want to do that?" (*Id*.) Trial counsel and Mrs. Dierolf then had the following exchange:

Q:    Who's idea was it for her to go over, Ma'am - -

A:    His.

Q:    - - to help him?

A:    Yes. I asked him not to.

(*Id*.)  Following this exchange, trial counsel asked Mrs. Dierolf a series of questions

suggesting that the victim was not being truthful in her account of the incident.  (*Id*.)

He then asked her if, after the incident, she had filed for divorce and had refused to

allow Dierolf to have visitation with their children, thereby being in contempt of a

court-ordered visitation schedule.  (*Id*.)  Upon the objection by the Commonwealth,

the trial court held the following sidebar:

| | |
|---|---|
| The court: | Mike, what's this all about? |
| Mr. Pendolphi: | It goes to bias, prejudice.  She hates her husband. |
| The court: | Wait.  What goes to bias and prejudice? |
| Mr. Pendolphi: | The fact that she filed for divorce against him, that she withheld custody.  She hates him, and she wants to come and testify against him in front of the jury.  It goes to bias, interest and prejudice, credibility. |
| The court: | The last part of your multi-parted question was something about a proceeding in front of Judge Conahan. |
| Mr. Pendolphi: | The fact that there was actually a Court Order granting him supervised visitation, she went so far as to even hating him that much to stop letting him have custody in violation of that Order.  That's how much I'm trying to - - |

* * *

|  | I'm trying to show that she went that far by hatred to actually violate a Court Order and preclude her children from being with her husband. |
|---|---|
| The court: | Well, one doesn't necessarily equate with the other. |
| Mr. Pendolphi: | It goes to prejudice. That's why she's here testifying. |
| The court: | What's the Commonwealth's position? |
| Ms. Roberts: | Your Honor, the Commonwealth's position is that all of this stuff occurred, the filing for the divorce and the custody of the children, after she found out about this incident with her niece. It didn't happen first and then she decided to come in and testify. So, it actually has absolutely nothing to do with it because it happened afterwards. |

(*Id.* at 2-3.) Following this discussion, the court ruled to allow the questioning, and trial counsel indicated that he would end his cross-examination with his last question relating to Mrs. Dierolf violating a court order on a visitation schedule. (*Id.*)

Trial counsel testified at the PCRA hearing about the testimony of Mrs. Dierolf. (Doc. 15-5 at 11-14.) Initially, the parties stipulated that any spousal privilege argument with respect to Mrs. Dierolf's testimony was eliminated by virtue of 42 Pa. Cons. Stat. Ann. § 5913, *see infra*, which provides that no such privilege exists in a criminal proceeding in which the defendant is charged with rape or involuntary deviate sexual intercourse. (Doc. 15-5 at 11.) Dierolf's PCRA counsel

then asked trial counsel about his cross-examination of Mrs. Dierolf, first asking the

following:

> Q: So when you asked the question . . . : "Do you recall telling her that you did not trust [the victim] going over your house? You didn't want her to go over?" Did you know - - did you have any idea what her answer was going to be?

> A: I didn't talk to her. So, obviously, I didn't know. That question was based upon the representations that my client gave to me in our case preparation, that his wife told him that she didn't trust the girl going over because the girl was promiscuous and she didn't trust her alone with her husband.

(*Id*. at 12.) Counsel later had further discussion regarding trial counsel's cross-

examination:

> Q: All right. So as part of [countering Mrs. Dierolf's direct testimony], was it your trial strategy to then try to attack the bias and motive of Mrs. Dierolf?

> A: It's always the first strategy in cross examination. I attacked for bias, interest and prejudice.

> Q: So can we agree that as trial counsel, that it was your intention and that you deliberately brought out the following facts on cross examination: That the parties had filed for a divorce?

> * * *

> A: Right. She filed for divorce.

> Q: . . . Do you agree that you brought out that testimony?

61

A:   Yes, I recall it without looking at it.

Q:   Can we also agree that on cross examination, you asked questions in which Mrs. Dierolf answered that after the DNA results came in, she did not believe her husband? . . .

A:   Yes, that's the transcript.

Q:   Would we also agree that on your cross examination, you brought out that there was a possible investigation of your client by Children and Youth? . . .

A:   Yes. They were all part of my - - again, if you look at the questions, I did it by the book. They were leading questions; trying to control the witness the way you do on cross examination. I asked her: Isn't it true that you filed for divorce. She's the one that spouted out the DNA. That's something I couldn't control. But the leading questions I did appropriately. I wanted the jury to know that the reason she's going to testify is that she hates her husband. She filed for divorce from him. She filed for custody against him. She precluded him from seeing his children, which I have in a custody Order. And she was adjudicated in contempt of court - - all perfectly legitimate cross examination techniques to show bias, interest and prejudice.

                              * * *

I felt that that was very important evidence for the jury to know, that she's done all these things to him, and that's why she's here voluntarily testifying against her husband.

(*Id*. at 13-14.)

Finally, counsel had the following exchange about the privileged

communication between the spouses:

62

Q:      I want to turn your attention to lines - - Page 103, lines 25, at the last line of Subpage 103, and down through lines 5 - - I'm sorry, 3. "Whose idea . . ."  Do you see it?

A:      "Whose idea was it for her to go over, Ma'am - -
        "His.
        "QUESTION: - - to help him?
        "Yes.  I asked him not to.
        "Now, by the way, you're here testifying against your own husband against your own free?
        "Yes."

Q:      Did you know prior to asking that question, whether or not there had been any discussions between Mr. Dierolf and his wife concerning [the victim] going over to the house?

                                  * * *

A:      I don't recall.  But I do recall that when I was trying to prepare her examination and I talked to Bill, that's what he told me about that; his wife didn't want her going over there because she didn't trust her.  Did I recall if there was prearranged plans? I honestly don't know.

Q:      Can you and I agree that that reference, when she disclosed that she had asked Mr. Dierolf not to do that, that that dealt with a communication that was between husband and wife based upon - -

A:      If what she was saying was true.  I had no knowledge as to whether they had a conversation.  I just know what my client told me when I prepared her exam.

Q:      Did you ask the Court to strike that testimony?

A:      No, I did not.

63

Q:	Did you object?

A:	No, I did not.

Q:	Did you ask for a cautionary instruction based upon privileged communication between spouses?

A:	No. It was in response to my question.

(*Id*. at 13.)

In this claim, Dierolf contends that trial counsel was ineffective for: (1) failing to object generally to the introduction of Mrs. Dierolf as a witness for the Commonwealth; (2) conducting a cross-examination of Mrs. Dierolf that was harmful to his case; and (3) failing to object to Mrs. Dierolf's testimony on confidential communications made between the spouses. First, as to counsel's failure to object to the testimony of Mrs. Dierolf, the court notes that under Pennsylvania law,

> In a criminal proceeding a person shall have the privilege, which he or she may waive, not to testify against his or her then lawful spouse except that there shall be no such privilege:
>
> * * *
>
> (4) in any criminal proceeding in which one of the charges pending against the defendant includes murder, involuntary deviate sexual intercourse or rape.

42 Pa. Cons. Stat. Ann. § 5913(4). Because under Pennsylvania law this spousal privilege does not apply in a case such as this where the charges included rape and

involuntary deviate sexual intercourse, any objection made by trial counsel would have lacked merit. Importantly, counsel cannot be considered ineffective for failing to raise a meritless objection. *See Moore v. Deputy Comm'r(s) of SCI-Huntingdon*, 946 F.2d 236, 245 (3d Cir. 1991). Thus, Dierolf has not demonstrated that trial counsel's failure to object generally to the introduction of Mrs. Dierolf fell below an objective standard of reasonableness, and thereby was ineffective here. *See Strickland*, 466 U.S. at 688-89. He is not entitled to habeas relief on this claim.

Second, with respect to counsel's cross-examination of Mrs. Dierolf, the court notes that in examining a claim that counsel was ineffective for improperly cross-examining a witness, the question is whether the cross-examination was so deficient or so lacking in tactical purpose as to warrant a finding of ineffectiveness. *See Box v. Petsock*, 697 F. Supp. 821, 834 (M.D. Pa. 1987) (citing *Commonwealth v. Buehl*, 508 A.2d 1167, 1176-1177 (Pa. 1986)). Here, it is true that through cross-examination of Mrs. Dierolf, it was established that, after the incident: (1) Mrs. Dierolf filed for divorce, (2) Mrs. Dierolf did not believe Dierolf's account of the incident, and (3) there was a possible investigation of Dierolf by Children and Youth Services. However, the court cannot conclude that trial counsel's line of questioning that eventually led to this evidence was so lacking in tactical purpose as to constitute

ineffective assistance of counsel.  By questioning Mrs. Dierolf about her potential

distrust of the victim and her hatred for her husband, trial counsel was trying to attack

the credibility of the victim and Mrs. Dierolf, as he stated both in sidebar at trial and

at the PCRA hearing.  He was also trying to show that Mrs. Dierolf's reason for

testifying against her husband was based on her prejudice against him.  Given that

counsel had a tactical reason in mind for pursuing this line of questioning, *i.e.*,

attacking the credibility of the witness and eliciting her prejudice, trial counsel cannot

be found ineffective with respect to this cross-examination.  Thus, Dierolf is not

entitled to habeas relief on this claim.

Third, with respect to counsel's failure to object to the testimony regarding

confidential communications, the court notes that Pennsylvania law provides, "In a

criminal proceeding neither husband nor wife shall be competent or permitted to

testify to confidential communications made by one to the other, unless this privilege

is waived upon the trial."  42 Pa. Cons. Stat. Ann. § 5914.  Here, the confidential

communication that Mrs. Dierolf revealed to the jury was that it was Dierolf's idea to

have the victim come to their house on the day of the incident.  In light of

Pennsylvania law, trial counsel should have either objected to or moved to strike that

testimony, or requested a cautionary instruction from the court. Thus, counsel's performance here was inadequate.

Turning then to the prejudice prong of the ineffectiveness standard, as set forth above, to establish prejudice, a petitioner must show that there is reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*. Furthermore, in considering whether a petitioner suffered prejudice, "the effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial: 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) (quoting *United States v. Gray*, 878 F.2d 702, 710-11 (3d Cir. 1989)).

The court concludes here that, because Dierolf's conviction is well-supported by the record, which included the victim's credible testimony as well as physical evidence of the crimes charged found on the victim's underwear, Dierolf was not prejudiced by this brief testimony regarding a confidential communication between the spouses. Because the totality of the evidence supports the conviction, Dierolf has

failed to establish that, but for his counsel's unprofessional error, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Thus, Dierolf is not entitled to habeas relief on this claim.

### e.     <u>Commonwealth's References to Evidence of Saliva</u>

Dierolf claims that his trial counsel was ineffective for failing to object to the repeated references to evidence of Dierolf's saliva on the victim's underwear. Dierolf raised this claim before the Superior Court in his appeal from the denial of his PCRA petition. However, in its decision affirming the denial of the PCRA petition, the Superior Court deemed this claim waived, and thus did not address it on the merits. As a result, the court will review this claim *de novo*. *See Simmons*, 581 F.3d at 165. Upon that review, the court finds that Dierolf is not entitled to relief on this claim.

The background of this claim is as follows. At trial, the Commonwealth presented Joanne Armaghan, an expert in serology, to testify about the stain found in the crotch area of the victim's underwear. (Doc. 12-1 at 24-25; Doc. 12-2 at 1-5, N.T. Trial.) Specifically, Ms. Armaghan testified that, after testing the stain for an enzyme found in human saliva, the stain "gave a strong positive reaction [for the enzyme] which gives us a strong indication that the presence of saliva was detected." (Doc. 12-2 at 2.) Although Ms. Armaghan could not unequivocally opine that the fluid was

saliva, she stated several times that "there is a strong indication that the stain - - the testing that I did, the indication is strongly pointing towards the presence of saliva." (*Id*. at 4.) As a result of this testimony, throughout the trial the Commonwealth argued that the fluid found on the victim's underwear was, in fact, saliva. Dierolf's trial counsel cross-examined Ms. Armaghan, repeatedly asking her to confirm for the jury that the testing for saliva on the stain was not conclusive, and she responded by repeatedly stating that the test did not definitely identify saliva on the underwear. (*Id*.)

Prior to closing arguments, the trial court instructed the jury as follows:

> In their arguments, Counsel will call your attention to the matters that they consider to be material in this case. They're going to ask you to draw certain references from that evidence. Please keep in mind, however, that you are not bound by Counsel's recollection of the evidence. It's going to be your recollection of the evidence that controls your deliberations. So in the event that there's a discrepancy between your recollection of what somebody said and Counsel's recollection, it's your recollection that controls; nor, are you limited in your consideration to that which is mentioned by Counsel.

(*Id*. at 14-15.)

At the PCRA hearing, trial counsel and Dierolf's PCRA counsel had the following exchange with respect to the expert's testimony on the fluid found on the victim's underwear.

Q: Now, . . . earlier in some of the questions that I was asking you, . . . you talked about, They found my client's saliva. Now, that's not really true, based upon the testimony at trial, is it, Mr. Pendolphi?

A: It was inconclusive.

Q: And can you and I agree that from a trial evidentiary tactical, strategic point of view, that's a critical difference?

A: They laid the proper foundation. The admissibility of it was coming in. The amount there, the inclusiveness, goes to the weight of the evidence, not the admissibility.

* * *

Q: So based upon a strategic and tactical point of view from either [the] perspective of the Commonwealth or Defendant, saliva could have been relevant to [the involuntary deviate sexual intercourse ("IDSI")] charge?

A: Correct. It was consistent with the victim's testimony of oral sex.

* * *

Q: So based upon the production of the evidence that the Commonwealth expert testified to, would you agree with me that at no point did the Commonwealth identify the substance that they found as saliva; true?

A: True, that is true.

Q: And never identified the saliva, even if it was present, which they did not testify to - - [was the Defendant's]?

A: Correct.

* * *

Q:    Under what circumstances did you feel as a part of legitimate trial
      strategy - - did you ever object to that?

A:    Her testifying as to that?  No.

Q:    Did you ever object to anybody referencing saliva, whether it was
      in direct examination, in any opening statement or any closing
      statement?  Did you at any point make any objection to the
      reference by the Commonwealth as to the existence of saliva?

* * *

A:    No, it was part of the reports.  It was part of the expert.  I was
      concentrating on concentrating my attack on the fact that there
      wasn't a sufficient amount to say beyond a reasonable doubt that it
      was saliva from my client.  So I would try to negate the IDSI
      charge.

Q:    There wasn't even sufficient evidence to produce that it was
      saliva, correct?

A:    It was still important.  The expert still testified.  It was coming out.
      I had to address it.

(Doc. 15-5 at 14-15, N.T. PCRA Hearing.)

In this claim, Dierolf contends that trial counsel was ineffective for failing to

object to the repeated references to evidence of Dierolf's saliva on the victim's

underwear.  More specifically, he argues that because it was established during

questioning of the serologist that the presence of saliva was inconclusive, the

71

evidence was inadmissible and trial counsel should have objected to the Commonwealth's references to saliva throughout the trial. This argument by Dierolf fails on numerous grounds. First, when Ms. Armaghan confirmed that testing on the evidence found on the victim's underwear was not conclusive for saliva, that testimony did not deem the evidence inadmissible. Nor was there any question at trial as to the relevance and admissibility of the evidence of fluid found on the victim's underwear.[7] Nevertheless, with respect to an objection by trial counsel, as stated by Pennsylvania's Eastern District Court, "[t]he Supreme Court has never held a lawyer to be ineffective for failing to object to the admission of relevant evidence. Such a finding would give attorneys a legitimate reason to object to all evidence introduced at trial, even that which is obviously relevant and admissible." *Brown v. Shannon*, No. 01-788, 2002 WL 1160817, at *7 (E.D. Pa. May 30, 2002). Further, counsel cannot be considered ineffective for failing to raise a meritless objection. *See Moore*, 946 F.2d at 245. Thus, because the evidence here was relevant and admissible, trial counsel cannot be deficient for failing to object to its admissibility.

---

[7] The court notes that had there been a ruling on the admissibility of the evidence, such a determination would have been based on an application of state law. Thus, this court could not reconsider such a ruling, as federal habeas relief may only be granted if the admission of the evidence amounted to a violation of federal law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'").

Further, trial counsel's cross-examination of Ms. Armaghan, which resulted in the jury hearing that the testing results were inconclusive, created an issue of fact for the jury to decide. Therefore, trial counsel was certainly pursuing a reasonable strategy by presenting the jury with inconclusive test results that could show that the evidence was not, in fact, saliva. As trial counsel later testified, "I was concentrating on concentrating my attack on the fact that there wasn't a sufficient amount to say beyond a reasonable doubt that it was saliva from my client." (Doc. 15-5 at 15.) This strategy of arguing that the fluid was not his client's saliva was conduct that "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Therefore, Dierolf has not overcome the presumption that, under the circumstances presented here, trial counsel's failure to object "might be considered sound trial strategy." *Id*. (citations omitted). As a result, Dierolf is not entitled to habeas relief on this claim.

### f.     Evidence of Prior Statements by Witnesses

Finally, Dierolf claims that his trial counsel was ineffective for failing to object to evidence of prior consistent statements of Commonwealth witnesses. Dierolf raised this claim before the Superior Court in his appeal from the denial of his PCRA petition. However, in its decision affirming the denial of the PCRA petition, the

Superior Court deemed this claim waived, and thus did not address it on the merits. As a result, the court will review this claim *de novo*. *See Simmons*, 581 F.3d at 165. Upon that review, the court finds that Dierolf is not entitled to relief on this claim.

The background of this claim is as follows. At trial, the Commonwealth presented Officer Daniel Lewis, the police officer who investigated the incident involving Dierolf and the victim. (Doc. 12-1 at 15-24.) During Officer Lewis' direct testimony, the prosecutor asked him whether the trial testimony of the victim's mother and father was substantially similar to the information that he had received from them prior to trial. (*Id*. at 17.) Dierolf's trial counsel did not object to this evidence of prior statements by these witnesses or request a cautionary instruction from the court. Further, at the PCRA hearing, trial counsel confirmed that he did not object. (Doc. 15-5 at 16, N.T. PCRA Hearing.)

The law of Pennsylvania limits the uses of prior consistent statements and does not permit their admission as substantive evidence. *Pennsylvania v. Cruz*, 414 A.2d 1032, 1036 (Pa. 1980); *Pennsylvania v. Gaddy*, 362 A.2d 217 (Pa. 1976). Moreover, while case law makes clear the propriety of a limiting instruction, failure to request one does not necessarily render assistance of counsel ineffective. Under *Strickland*, even assuming counsel's performance was professionally unreasonable, the petitioner

74

must affirmatively prove that it was prejudicial to the defense. *Strickland*, 466 U.S. at 691-95. That is, absent the errors, the factfinders would have had a reasonable doubt with respect to guilt. *Id*.

In the instant case, it is clear that Dierolf's counsel could have objected to the prosecutor's inquiry of Officer Lewis as to the prior consistent statements of the victim's parents. However, he did not object or request a cautionary instruction. Even with trial counsel's failure here, the court concludes that Dierolf was not prejudiced by the error because he has not proved that, absent counsel's failure to object or to request a cautionary instruction, the jury would have had a reasonable doubt as to his guilt. To that end, Officer Lewis' answer to the prosecutor's question of whether the testimony of the victim's parents was substantially similar to the information he had already received from them was: "Yes, it was." (Doc. 12-1 at 17.) In light of the overwhelming evidence of guilt, which included the victim's credible testimony as well as physical evidence of the crimes charged found on the victim's underwear, the court cannot conclude that this simple three-word answer affected the outcome of the trial. Thus, Dierolf has not shown that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different, thereby establishing prejudice. Accordingly, Dierolf is not entitled to habeas relief on this claim.

## III.   <u>Conclusion</u>

Based on the foregoing determination that Dierolf's claims are without merit, the court will deny the petition for writ of habeas corpus. (Doc. 1.)

The court must now determine whether a certificate of appealability should issue. A court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requires that the petitioner "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, the court denies a certificate of appealability because jurists of reason would not find it debatable that denial of the petition because Dierolf's claims are without merit is correct.

An appropriate order will issue.

S/SYLVIA H. RAMBO
United States District Judge

Dated: June 12, 2013

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIAM H. DIEROLF, IV,** | : | |
| | : | |
| **Petitioner** | : | **CIVIL NO. 1:CV-11-01999** |
| | : | |
| **v.** | : | **(Judge Rambo)** |
| | : | |
| **BRIAN THOMPSON,** | : | |
| | : | |
| **Respondent** | : | |

# O R D E R

**AND NOW**, this 12th day of June, 2013, upon consideration of the petition for writ of habeas corpus (Doc. 1), and for the reasons set forth in the accompanying memorandum, **IT IS HEREBY ORDERED THAT**:

1) The petition for writ of habeas corpus (Doc. 1) is **DENIED**.

2) The Clerk of Court is directed to **CLOSE** this case.

3) There is no basis for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c).


S/SYLVIA H. RAMBO
United States District Judge